**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **A.M.** *et al.*, | |
| *Plaintiffs*, | **Civil Action** |
| *v.* | **No. 21-cv-1926** |
| **WALLINGFORD-SWARTHMORE SCHOOL DISTRICT,** | |
| *Defendant*. | |

<u>**MEMORANDUM OPINION**</u>

**GOLDBERG, J.**                                        **September 21, 2022**

This lawsuit raises issues under the Individuals with Disabilities in Education Act (IDEA) and a school district's obligation to educate a student with significant academic potential but whose achievement is limited by a disability. All parties agree the student in this case, A.M., has disabilities in writing, concentration, and executive function but has higher than average abilities in other subjects. A.M.'s parents ("Parents") contend Defendant Wallingford-Swarthmore School District (the "District") failed to provide A.M. with an education appropriate in light of this unique combination.

Parents brought this lawsuit pursuant to the IDEA, 20 U.S.C. § 1400, and § 504 of the Rehabilitation Act, 29 U.S.C. § 924, and challenge the decision of a state hearing officer (the "Hearing Officer") denying them relief. Presently before me is the Parents' Motion for Judgment on the Administrative Record. Parents ask me to reverse the Hearing Officer's decision and award compensatory education, tuition reimbursement, and expert and attorneys' fees. The District urges that the Hearing Officer's decision be affirmed.

1

Previously, I remanded this case to the Hearing Office to analyze whether the District's plan for A.M.'s ninth- and tenth-grade education was "appropriately ambitious" in light of A.M.'s unique characteristics under the standard of <u>Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1</u>, 137 S. Ct. 988, 1001 (2017). The Hearing Office concluded that it was. Parents continue to disagree with the Hearing Officer's decision.

As explained below, and after a review of the Hearing Officer's decision and submissions by the parties, I find that the District provided A.M. with an education that complied with the requirements of federal law. I will therefore deny Parents' Motion and affirm the decision of the Hearing Officer.

## I.   <u>FACTS</u>

As the Hearing Officer observed, the relevant facts are largely undisputed. A.M. is a student who attended public schools in Wallingford-Swarthmore School District in Pennsylvania through the eighth grade. A description of A.M.'s characteristics and a history of the District's efforts to educate A.M. are set out below.

### A.   A.M.'s Characteristics

The parties agree that A.M. is highly intelligent and that he has disabilities that impact his education. Parents and their experts refer to this combination as "twice exceptional." (Jones Report, S-37,[1] at 1.) From an early age, A.M. scored at the 99th percentile in tests of math and reading ability, and teachers reported A.M.'s "ability to acquire, understand and demonstrate

---

[1] Exhibits prefixed with "S-" and "P-" refer to the exhibits presented to the Hearing Officer.

mastery of new learning as superior." (June 2017 IEP, S-11, at 7-9.) The District placed A.M. in its program for "gifted" students. (Id. at 31-32; Hearing Officer Decision[2] at 5.)

Beginning in fourth grade, A.M. was identified as having attention deficit hyperactivity disorder (ADHD) and a specific learning disability in written expression. The parties agree A.M. has four disabilities that affect his education: ADHD, a specific learning disability in written expression, deficits in executive functioning, and difficulties with self-advocacy. (May 2019 IEP, S33, at 14-20.) It is undisputed that these disabilities entitle A.M. to accommodations under the IDEA.

A.M's diagnosis of ADHD relates to his inattentive behavior: he is easily distractable and this tendency interferes with his ability to complete tasks. (Jones Report, S-37, at 16.) A.M.'s learning disability in written expression causes him to struggle with the process of writing, even though his skill in crafting sentences has been described as "strong." (May 2019 IEP, S-33, at 14.) A.M. therefore has trouble initiating and completing writing assignments. (N.T.[3] 83.) A.M.'s difficulties in executive functioning limit his capacity to "self-regulate" in the execution of tasks. (Jones Report, S-37, at 13-15; May 2019 IEP, S-33, at 20; Hearing Officer Decision at 18.) Finally, A.M.'s deficits in self-advocacy prevent him from asking for help when needed, even causing him to refuse one-on-one help out of frustration. (May 2019 IEP, S-33, at 14; N.T. 345.)

A.M.'s teachers in the District reported that A.M. had a tendency to become overwhelmed, "shut down," and even "curl[] up into a defensive position and … not respond to questions." (May 2019 IEP, S-33, at 6; May 2018 IEP, S-15, at 12.) A.M.'s therapist described A.M.'s shut-downs as him becoming "sensorily overwhelmed in life." (N.T. 517.) Although A.M.'s shut-downs

---

[2] Citations to the Hearing Officer Decision refer to the decision on remand, which expands upon the Hearing Officer's initial decision.

[3] Citations to "N.T." refer to the hearing transcript.

tended to be triggered by writing assignments, the emotional consequences spilled over into A.M.'s other work. Because A.M. struggled with executive functioning, he had trouble managing and prioritizing his writing workload, putting him at risk of shutting down. And, because of A.M.'s deficits in self-advocacy, he failed to ask teachers to help him back to a productive routine. (See May 2018 IEP, S-15, at 12.) As explained below, this combination created significant difficulties for A.M.'s education.

Parents' experts and the District's psychologist agree that A.M. can benefit from challenging tasks that hold his interest. The District's psychologist characterized this trait as not so much a "deficit" as A.M.'s "personality." (N.T. 448, 459-60, 490; Jones Report, S-37, at 1, 16, 25, 32.) The District's psychologist therefore recommended that A.M. be in a school environment where "he could be challenged, where his areas of interest are addressed," and where "his needs related to writing and … task initiation are supported." (N.T. 490.)

**B.    A.M.'s Accommodations in the District**

The District offered A.M. accommodations for his disabilities from fourth grade onward. The accommodations relevant to the present dispute are summarized below.

1.    <u>Seventh Grade (2017-2018)</u>

The pertinent chronology of the District's efforts to accommodate A.M.'s disabilities begins in seventh grade, which A.M. spent in the District at Strath Haven Middle School. That year A.M. was provided with an individualized education program or "IEP." "[A]n IEP … is a program of individualized instruction for each special education student." <u>Ridley Sch. Dist. v.</u>

M.R., 680 F.3d 260, 269 (3d Cir. 2012). The relevant features of A.M.'s seventh-grade IEP are as follows[4]:

Goals: As required by law, A.M.'s seventh-grade IEP contained "a statement of measurable annual goals." 20 U.S.C. § 1414(d)(1)(A)(i)(II). A.M.'s goal in writing was to meet at least two of the following three expectations: (1) "Initiate[] written response[s] within teacher given time frame"; (2) "Produce[] writing with sufficient details and content per teacher expectation"; and (3) "Complete[] writing assignment by due date." (June 2017 IEP, S-11, at 24.) The IEP noted A.M. typically required "an extension of 3 weeks to 1 month" on writing assignments. (Id.) A.M.'s goal in "Student Skills" was to complete 85% of writing assignments within the allotted time. (Id. at 25.) A.M.'s goal in executive functioning was to "have organized binders …, use his planner/agenda to track deadlines or tasks, use … a homework folder for assignments," and have "an organized locker." (Id. at 27.)

Services: A.M.'s seventh-grade IEP also set out the requisite services the District would provide to help A.M. meet his goals. See 20 U.S.C. § 1414(d)(1)(A)(i)(IV). A.M. was provided a detailed list of services both inside and outside his academic classrooms. Services that would be implemented by A.M.'s academic teachers included: teacher check-ins, breaking tasks into smaller chunks, allowing A.M. to stand at his desk, providing pre-writing conferences for A.M. on writing assignments, and offering time extensions (of 50%) on long writing assignments. (June 2017 IEP, S-11, at 30-32.) A.M. was also provided with a learning support class that was separate from his academic classes. In the learning support class, A.M. would have an opportunity to complete

---

[4] For convenience, this opinion refers to A.M.'s IEPs as his seventh-, eighth-, and ninth-grade IEPs. In the interest of accuracy, it should be noted that each IEP actually took effect near the end of the previous school year.

schoolwork with supervision from the support teacher and receive instruction in organization, task management, and self-advocacy. (Id. at 32-33.)

As mandated by the IDEA, the District tracked A.M.'s progress on his IEP goals. A.M. was entirely unsuccessful in two of his three writing goals: he did not initiate writing assignments on time and did not produce writing with sufficient detail and content. (See May 2018 IEP, S15, at 9-10.) He did complete most writing assignments by the extended due date, but not by the original due date. (Id.) A.M.'s language arts teacher reported that A.M. struggled with writing in seventh grade. When he was supposed to begin writing, he would "sit at his desk and not ask for help." (Id. at 12.) When help was offered, A.M. would "shut[] down" and "curl[] up into a defensive position and … not respond to questions." (Id.)

In addition, A.M. was offered a supplemental writing class during the summer between seventh and eighth grades. (June 2017 IEP, S-11, at 36.) The goal for the summer class was to produce a complete essay, but A.M. managed to write only two paragraphs. (Progress Monitoring Data Collection Log, P-15.)

2.    Eighth Grade

A.M. continued to have an IEP in eighth grade, which also contained the required goals, services, and assessment of A.M.'s progress.

Goals: A.M.'s writing goal in eighth grade was adjusted to require that he initiate writing "within 15 minutes after actively brainstorming with the teacher" and complete a finished product by the due date with 100% accuracy. (May 2018 IEP, S-15, at 23.) In executive functioning, A.M. was to complete assignments on time with 90% accuracy. (Id. at 25.) A.M. was also given a goal in self-advocacy to arrange to stay after class with his teachers for help with assignments. (Id. at 27.)

A.M.'s eighth-grade services were substantially the same as his seventh-grade services. (Compare S-11 at 30-33 with S-15 at 31-32.) A.M.'s eighth-grade language arts teacher testified in regard to how she implemented those services in her classroom. The following is illustrative:

> Q. … Can you describe how you approached [A.M.'s] need for executive functioning in the area of [the act of] writing?
>
> A. By the [act of] writing I mean, pencil to paper and I would help him by, I think, brainstorming and things like that. I would sit down and conference with him side-by-side. And sometimes I would write down the actual brainstorm. And he would be able to use that list to write, whether it be typing or the physical act of writing.

(N.T. 264-65.) The teacher also paired A.M. with "like-minded peers" and observed that A.M. responded better to small-group work. (N.T. 267.) A.M. also received the accommodation specified in his IEP for preferential seating and the option of standing at his desk. (N.T. 276.)

A.M. continued in the learning support class in eighth grade. Because the class took time away from A.M.'s school activities, it was planned for A.M. to be removed from the class if his executive functioning skills improved. (N.T. 97-100.) As the year progressed, it became evident that A.M. still needed support in executive functioning, and Parents requested that A.M. remain in the class. (N.T. 182, 391.)

A.M. did not succeed in his writing goals during eighth grade. (See May 2019 IEP, S-33, at 13.) He consistently failed to begin writing within the required time, and often failed to complete writing assignments by the due date. (Id.) A.M. was similarly unsuccessful in achieving his executive functioning goal. He completed far below the target 90% of assignments by the due date. (Id. at 14.) In particular, A.M. managed to complete only 36% of assignments in French by the due date. (Id.) A.M.'s language arts teacher noted that A.M. continued to struggle with staying on task and often failed to complete any work outside of school. (Id. at 11.) During the second quarter, A.M. failed to initiate and complete essentially all of his writing assignments. (Id. at 33-34.)

In the fall and winter, A.M. began to fall behind in several classes causing him to feel "overwhelmed" and "shut[] down." (N.T. 101-104, 248; May 2019 IEP, S-33, at 9.) Parents grew concerned and asked the District to help ease A.M.'s workload. (N.T. 105-08.) As an accommodation, the District offered, and Parents accepted, that A.M. be excused from completing 50% of school assignments across all classes. (Id.) Notably, despite being excused from 50% of all assignments, and receiving 50% extended time on the remainder, A.M. was still unsuccessful at initiating and completing most of them. (See May 2019 IEP, S-33, at 33-34.)

3.    Plans for Ninth Grade

As explained below, A.M. did not attend ninth grade in the District. Had A.M. stayed in the District, he would have started at Strath Haven High School. In preparation for A.M.'s possible ninth-grade year in the District, A.M. was again provided with an IEP.[5] The Chair of the District's Special Education Department, who helped draft A.M.'s ninth-grade IEP, stated that she was happy with A.M.'s progress in eighth grade and "enthusiastic" for his transition to the High School. (N.T. 803-04.)

A.M.'s goals and services in his ninth-grade IEP were essentially identical to the goals and services of prior years. (See May 2019 IEP, S-33, at 31, 37, 40, 48-51.) The only notable change was the addition of occupational therapy and counseling services. (Id. at 51.)

As in prior years, A.M. was offered a learning support class. Due to the High School's block scheduling, A.M.'s support class would now be one of four 80-minute class periods each day. (N.T. 117-20, 123.) Parents were concerned about A.M. losing 25% of the school day to a nonacademic class. (Id.) The 80-minute learning support block would be split between instruction on executive functioning and time for A.M. to complete schoolwork. (N.T. 809-10.) The Chair of

---

[5] As noted, this IEP actually took effect near the end of eighth grade.

the District's Special Education Department testified that A.M. would likely not have time in his schedule for a world language class due to the 80-minute block allocated to learning support. (N.T. 857.)

### 4.   Plans for Tenth Grade

After A.M. spent ninth grade at a private school (discussed in more detail below), the District drafted an IEP for A.M.'s tenth grade in the hopes that A.M. would return to the District, which A.M. did not do. Although A.M.'s tenth-grade IEP included essentially the same goals as in prior years, there were changes to the services offered, in part based on what the District learned from A.M.'s experience in the private school. (N.T. 854-55.)

A.M. would no longer be given a dedicated period for learning support but would receive special education through his academic classes. This decision was based on A.M.'s experience in the private school. (N.T. 855.) In addition, it was specified that A.M. would be given opportunities "for alternate assignments to express creativity and assist with writer's block." (February 2010 IEP, S-48, at 43.) A.M. was also to receive time for "movement breaks" during class." (Id.) The District offered two additional accommodations in the form of reduced workload: A.M. was to be limited to two academic classes per semester, and the requirement that A.M. take a foreign language was waived. (Id. at 44.)

### C.   A.M.'s Private Schooling

Beginning with A.M.'s ninth-grade year, Parents enrolled A.M. in a private school. After consulting with a psychologist, Parents decided on the Grayson School, which bills itself as a school for gifted children. Parents believed A.M. would perform better at Grayson for three reasons: First, class sizes were smaller at Grayson, which Parents believed would allow A.M. to receive more immediate assistance when he showed signs of struggling with task completion. Second, Parents and their experts characterize the environment at Grayson as free from

distractions, which would help A.M. focus. Third, the curriculum at Grayson was more challenging than the curriculum at Strath Haven, which Parents believed would help to hold A.M.'s attention.

While some aspects of A.M.'s performance at Grayson are disputed, the parties agree that A.M. experienced less stress and anxiety after leaving the public school. The District's psychologist observed A.M. at Grayson and reported that A.M. seemed happy, comfortable, and not anxious. (N.T. 447.) When A.M. was pressed to write, he did not seem "upset about it or overwhelmed," even when he was unable to complete the assignment. (Id.) Parents' psychologist also observed A.M. to be "comfortable and at ease" in the classroom. (N.T. 746.) A.M.'s therapist described A.M. as a "different child" since switching schools. (N.T. 518.) She noted that A.M. was less anxious and more "engaged" with people around him. (N.T. 518-19.) A.M.'s mother reported that A.M. did not "shut down" at Grayson. (N.T. 131.)

There is less agreement as to how Grayson impacted A.M.'s ability to succeed academically. While Parents characterize A.M.'s performance at Grayson as "thriving," a direct comparison is difficult because Grayson uses a different curriculum than Strath Haven. A.M.'s report card at Grayson includes positive reviews from his teachers. (Grayson Report Card, P-17.) He received grades of "meets" or "exceeds" expectations in most subjects, with two exceptions: in the fourth quarter, A.M. received grades of "developing" in three areas of writing (thesis construction, use of evidence, and essay writing) and one area of social studies (using historical data from a variety of sources). (Id. at 37-38.)

Of particular note, A.M. continued to struggle with writing at Grayson. In the third quarter of A.M.'s ninth-grade year, A.M.'s writing teacher at Grayson characterized A.M.'s work as "great" but noted that A.M. had "handed in little completed work since the beginning of the quarter." (Grayson Report Card, P-17, at 28.) The teacher observed that A.M. "struggles … to

power through assignments." (Id.) In the fourth quarter, the teacher noted that writing had been "more of a challenge" for A.M. (Id. at 38.) It is unclear from the record whether and when the missing assignments were completed, but a Grayson administrator testified that assignment completion is a "requirement" at Grayson and students do not have the option to "[]not turn something in and just get a zero for that assignment." (N.T. 625.) Instead, students with outstanding assignments are put on "academic probation." (Id.) The Grayson administrator stated that A.M. was never excused from completing writing assignments except for accommodations given to all students during the start of the COVID-19 pandemic. (N.T. 641-42.)

A.M.'s mother agreed that writing remained challenging for A.M. at Grayson, but she attributed some of A.M.'s struggles in the fourth quarter to the pandemic and the fact that Grayson was then fully remote. (N.T. at 159-60, 163-64, 194.) As in the District, A.M. was given a goal for his writing at Grayson, but a less ambitious one than in his prior IEPs: instead of having to complete a certain percentage of writing assignments on time, A.M.'s new goal was to "write without crying." (Grayson Individualized Growth Plan, S-47, at 1.)

The District's psychologist observed A.M. during a writing task at Grayson and concluded that while A.M. appeared happy and stress-free, he still had "a lot of difficulty completing that assignment independently." (N.T. 470-71.) The psychologist further opined that the teacher did not appear to have strategies to help A.M. move forward and characterized the activity as "kind of wasting time." (N.T. 472.)

Unlike the District, Grayson did not have a dedicated special education program. In its application for licensure, Grayson indicated it offered no special education services. (S-72 at 3.) Grayson also did not have teachers certified in special education. (N.T. 654.) While not entirely clear from the record, it appears the only service A.M. received at Grayson other than services

provided to all Grayson students was that A.M. was given "extra one-on-one time to conference with his teachers." (N.T. 628.) This support time required A.M. to come in before the start of the regular school day. (N.T. 686.) A.M. received other services such as a word processor and flexible deadlines on assignments, which were accommodations the school provided to all students. Instead of an IEP, A.M. was given an "individualized growth plan" that contained a less detailed specification of goals and services than an IEP. (P-12.) Nevertheless, Parents were happy with A.M.'s education at Grayson and believed A.M.'s academic teachers at Grayson were capable of supporting A.M.'s writing, executive functioning, and self-advocacy needs without the aid of a special education department.

## II.   **THE HEARING OFFICER'S DECISION**

Parents sought to resolve their disagreements with the District over A.M.'s education through what the IDEA terms a "due process hearing" before the Hearing Officer. 20 U.S.C. § 1415(f). The Hearing Officer found that the District offered A.M. an education that complied with the IDEA. He determined that "the District implemented programming that fully met [A.M.]'s needs and led to progress on the student's goals." (Hearing Officer Decision at 19.) Although "progress was not always uniform, … a granular look at the student's progress monitoring shows progress, especially from the start of the [eighth grade] school year to its end." (Id.) The Hearing Officer thus concluded that "the District designed and implemented programming for the student's 8th grade year that was reasonably calculated to provide, and did provide, significant learning in light of the student's unique needs." (Id.)

Although not necessary in light of the above conclusion, the Hearing Officer also considered, in the alternative, whether Grayson was an appropriate private placement. The Hearing Officer concluded it was not. The Hearing Officer noted that Grayson provided "a very strong

12

academic program for gifted students, and it is no surprise that, academically, the student is doing well there." (<u>Id.</u> at 22.) However, the Hearing Officer felt that Grayson did not "meet[] the special education needs of" A.M. because it did not provide "individualized, programmatic interventions" for A.M.'s disabilities. (<u>Id.</u>) Based on these conclusions, the Hearing Officer denied Parents relief.

Thereafter, I determined that the Hearing Officer's decision did not "enable me to determine whether the District's goal for A.M.'s progress was 'appropriately ambitious in light of his circumstances.'" (ECF No. 25 ¶ 5 (quoting <u>Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1</u>, 137 S. Ct. 988, 1000 (2017)).) In particular, the Hearing Officer did not "compare A.M.'s planned ninth- and tenth-grade curriculum to the one offered nondisabled students and assess whether the variation between the two was justified in light of A.M.'s abilities." (<u>Id.</u> ¶ 4.) I remanded the case to the Hearing Officer. On remand, the Hearing Officer again denied relief, finding that A.M.'s IEPs contained goals that were "appropriately ambitious" in light of A.M.'s abilities. The Hearing Officer's amended decision is now before me.

## III.   <u>LEGAL STANDARD</u>

The standard for review of a hearing officer decision has been described as "modified <u>de novo</u>." <u>D.S. v. Bayonne Bd. of Educ.</u>, 602 F.3d 553, 564 (3d Cir. 2010). Although a district court may make factual findings by a preponderance of the evidence, the court "must give 'due weight' and deference to the findings in the administrative proceedings." <u>Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.</u>, 381 F.3d 194, 199 (3d Cir. 2004) (citing 20 U.S.C. § 1415(1)(2)(B)(iii)). "Factual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." <u>P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.</u>, 585 F.3d 727, 734 (3d Cir. 2009) (quotation marks omitted). "[A] [d]istrict [c]ourt must accept the state agency's credibility determinations unless the

non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." <u>P.S.</u>, 381 F.3d at 199 (quotation marks and emphasis omitted). The party seeking to overturn the hearing officer's decision bears the burden of persuasion as to factual findings. <u>M.R.</u>, 680 F.3d at 270.

## IV.   <u>DISCUSSION</u>

### A.   **A.M.'s Education in the District**

The parties first dispute whether the District provided A.M. with an education that complied with the IDEA. "The IDEA requires states receiving federal education funding to provide every disabled child with a 'free appropriate public education'" ("FAPE"). <u>M.R.</u>, 680 F.3d at 268 (citing 20 U.S.C. § 1412(a)(1)). There are no "bright line rules to determine whether a student is receiving a meaningful educational benefit under the IDEA." <u>D.S.</u>, 602 F.3d at 568. Rather, the adequacy of the educational program offered "turns on the unique circumstances of [each] child." <u>Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1</u>, 137 S. Ct. 988, 1001 (2017). "[U]nder the IDEA, courts must accord significant deference to the choices made by school officials as to what constitutes an appropriate program for each student." <u>M.R.</u>, 680 F.3d at 277.

"To meet its substantive obligation under the IDEA, a school must offer an [individualized education plan (IEP)] reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." <u>Endrew F.</u>, 137 S. Ct. at 999. A school district "does not need to offer education that maximizes each child's potential." <u>R.S. v. Montgomery Twp. Bd. of Educ.</u>, No. 10-cv-5265, 2012 WL 2119148, at *3 (D.N.J. June 11, 2012) (quotation marks and alterations omitted). Likewise, the district is not obligated to "provide 'the optimal level of services,' or incorporate every program requested by the child's parents." <u>M.R.</u>, 680 F.3d at 269. What is required is a "basic floor of opportunity." <u>Id.</u> In addition, "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student," not based on whether the student

ultimately succeeds or fails. Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993). Nevertheless, "evidence of a student's later educational progress may be considered in determining whether the original IEP was reasonably calculated to afford some educational benefit." D.S., 602 F.3d at 567 (alterations omitted).

"A focus on the particular child is at the core of the IDEA." Endrew F., 137 S. Ct. at 999. The IDEA recognizes that "the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between." Board of Education of Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 202 (1982). "When students display considerable intellectual potential, [the] IDEA requires a great deal more than a negligible benefit." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 247 (3d Cir. 1999) (alterations and quotation marks omitted). But the IDEA does not require a school district to strive for a level of academic performance the student is not capable of meeting. See Endrew F., 137 S. Ct. at 1001.

For most children, a FAPE will consist of education in the regular classroom, and, therefore, "the IDEA requires that children with disabilities receive education in the regular classroom 'whenever possible.'" Endrew F., 137 S. Ct. at 999. "[A] special education student who is being educated in the regular classrooms of a public school system and who is performing well enough to advance from grade to grade generally will be considered to be receiving a meaningful educational benefit under the IDEA." D.S., 602 F.3d at 567 (quotation marks omitted). This is because when a student is performing at grade level in the school's regular curriculum, "the system itself monitors the educational progress of the child. Regular examinations are administered, grades are awarded, and yearly advancement to higher grade levels is permitted for those children

who attain an adequate knowledge of the course material." <u>Endrew F.</u>, 137 S. Ct. at 999. "Progress through this system is what our society generally means by an 'education.'" <u>Id.</u>

In <u>Board of Education of Hendrick Hudson Central School District v. Rowley</u>, 458 U.S. 176 (1982), the district court found that the student, who was deaf, "perform[ed] better than the average child in her class and [was] advancing easily from grade to grade." <u>Id.</u> at 185. But the district court also recognized that the student "[was] not learning as much, or performing as well academically, as she would [have] without her handicap," creating a "shortfall" between the student's academic potential and her performance. <u>Id.</u> at 185-86. The Supreme Court nevertheless found that the student's education was appropriate, and the fact that the student could have performed better than her peers did not obligate the school district to "maximize" the student's potential. <u>Id.</u> at 200.

By contrast, a school district may fail to provide a FAPE when it unreasonably deprives an otherwise capable student of a grade-level education. <u>See</u> <u>Ringwood Bd. of Educ. v. K.H.J. ex rel. K.F.J.</u>, 258 F. App'x 399, 403 (3d Cir. 2007). In <u>K.H.J.</u>, the hearing officer found that the student possessed "'above average' intelligence" and the "potential of performing <u>at least</u> in the average grade level in reading." <u>Id.</u> at 402-03. The district, however, offered a plan for the student's education that put the student "one to two years behind his grade level in reading and writing." <u>Id.</u> at 402. The hearing officer concluded, and a panel of the Third Circuit agreed, that this goal was not sufficiently ambitious in light of the student's abilities and therefore did not provide a FAPE. <u>Id.</u> at 403.

Performing at grade level is not a reasonable expectation for all students, and the IDEA does not require it when the student's characteristics make such a goal inappropriate. <u>Endrew F.</u>, 137 S. Ct. at 1001. For example, in <u>H.G. ex rel. Davis v. Upper Dublin Sch. Dist.</u>, No. 13-cv-1976,

2015 WL 1808538 (E.D. Pa. Apr. 17, 2015), the hearing officer found, and the district court agreed, that an educational program that removed the student from regular language arts and math classes was appropriate in light of reports from the student's teachers that the student had "a significant need for direct, systematic instruction at a modified pace." Id. at *12.

In evaluating whether the District provided A.M. with a FAPE, I begin with A.M.'s progress in eighth grade, as it shows what information was available to the District when it designed the goals and services that would apply at the start of A.M.'s ninth-grade year. The administrative record reflects that A.M.'s progress in eighth grade was close to, but not at, grade level. While A.M. was educated in grade-level classes (including several advanced classes), the District accommodated A.M.'s disabilities by holding A.M. to less rigorous standards than his peers in writing and assignment completion. A.M. was excused from completing half of school assignments and given longer deadlines on the remainder. Despite those accommodations, A.M. did not finish (or, in some cases, even start) a large portion of writing assignments by the extended due date. Most strikingly, during the second quarter of eighth grade, A.M. failed to initiate nearly all of his writing assignments. (May 2019 IEP, S-33, at 33-34.)

A.M.'s struggles with writing were not limited to eighth grade and reflect a cycle that repeated over multiple years. For example, there is substantial similarity in A.M.'s ability to meet his goals between his seventh- and eighth-grade IEPs. And during a summer program between those two grades designed to improve A.M.'s writing, he only managed to write two paragraphs during the entire summer. This consistency suggests that the District could have expected A.M. to continue to progress near, but slightly below, grade level under the accommodations of A.M.'s ninth-grade IEP, which were substantially similar to those offered in prior years. For example, although A.M.'s ninth-grade IEP, like his prior IEPs, included a goal that A.M. complete 90% of

writing assignments by the deadline, it would have been overly optimistic, in light of past experience, for the District to expect this goal to be met.

Parents argue that the repetition each year of unmet IEP goals in written expression and executive functioning show that A.M.'s progress was "stagnant." (Parents' Brief at 11.) However, repetition of IEP goals does not indicate a lack of progress where, each year, those goals are applied to a new and more challenging set of classes. See D.S., 602 F.3d at 567 (noting that performance at grade level is usually sufficient progress). To the contrary, the record reflects that A.M. did make progress: he completed assignments, passed classes, and advanced to higher grades. But Parents are correct that his progress was somewhat below grade level. The District planned for A.M. to complete fewer assignments, and at lower standards, than it expected of other students in the school.

Parents point out two other ways in which A.M.'s planned ninth-grade education was slightly less rigorous than that offered to nondisabled students. First, the District confined A.M. to two academic subjects per semester and waived the requirement that A.M. take a foreign language. While the District emphasizes that A.M. was not prohibited from taking a foreign language, the Chair of the Special Education Department conceded that time dedicated to learning support would likely prevent A.M. from taking a foreign language. Second, the continuation of A.M.'s learning support class to the High School's 80-minute block schedule meant that A.M. would have only 75% of the time normally available for academic classes. Taken together, these facts show that the District planned for A.M. to receive a ninth-grade education with somewhat reduced academic content compared to the education the District offered to students without disabilities. I note that the shortfall was not severe because A.M. would continue to be educated in the regular academic

classroom, including some advanced classes, and to have the option (although not the requirement) of completing all schoolwork offered to his nondisabled peers.

The fact that A.M.'s progress was below grade level is only part of the inquiry because the IDEA does not mandate that a child's education have a successful outcome. See K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist., 806 F. Supp. 2d 806, 822 (E.D. Pa. 2011). The question instead is whether the District's plan for A.M.'s education was "appropriately ambitious" in light of A.M.'s unique characteristics under the standard of Endrew F. In arguing that it was not, Parents point to A.M.'s mastery of subject matter, which in Parents' view shows that A.M. was capable of performing at (or better than) grade level had he been appropriately accommodated. Parents also offer A.M.'s performance at Grayson as evidence that A.M. was capable of excelling under the right conditions. The District responds that A.M.'s reduced writing workload was an accommodation designed to give A.M. freedom to develop his strengths in other areas with less anxiety, and further notes that even at Grayson, A.M. struggled to finish writing assignments on time.

For the following reasons, I find that the District offered A.M. an education that was appropriately ambitious in light of A.M.'s unique characteristics. To begin, the Hearing Officer's conclusion that the District offered A.M. significant and professionally designed supports both inside and outside his regular classroom is well supported. The administrative record contains detailed testimony from District employees, including A.M.'s academic and special education teachers, describing how they supported A.M.'s writing, designed accommodations for his IEPs, and monitored his progress. Courts owe "significant deference" to the educational judgment of these school employees. M.R., 680 F.3d at 277. With few exceptions, Parents do not take issue with the specifics of these services, focusing instead on their contention that A.M. could not

succeed in a public school. The District's substantial effort to support A.M.'s writing and executive functioning shows that, although A.M.'s progress in these areas fell below the goals specified in his IEPs, it was not unreasonable for the District to aim for a similar level of progress at the start of A.M.'s ninth-grade year. Put simply, the information available to the District at the end of eighth grade suggested that A.M. was already performing as well as could be reasonably hoped for.

A.M.'s experience at Grayson corroborates my conclusion that the District's goal for A.M.'s education was appropriately ambitious. While the District's compliance with the IDEA is to be measured at the outset rather than based on A.M.'s ultimate success, a student's later performance at an alternate placement may shed light on whether the original education offered by the District was appropriate. See Fuhrmann, 993 F.2d at 1039 n.10. The fact that A.M. continued to have difficulties initiating and completing writing assignments at Grayson is consistent with the view that his struggles in these areas at Strath Haven Middle School were not due to inadequate services from the District. Writing was and would remain an area of particular difficulty for A.M.

Parents' principal contention is that A.M. simply could not be accommodated in a public school because A.M. needed a smaller classroom free from distractions, teachers who were available during class for frequent one-on-one support, and opportunities for more challenging classes than were available in the District. The administrative record does show that Grayson offered benefits, most significantly by reducing A.M.'s anxiety and permitting him to study new subjects. And Parents' decision to enroll A.M. in Grayson may well have been a prudent one. But it is important to keep in mind that the issue is not "whether the unilateral private placement chosen by the parents confers a better education" because "the IDEA guarantees a meaningful educational benefit, not the best possible education." L.W. ex rel. R.W. v. Norwood Bd. of Educ., No. 11-cv-

2246, 2012 WL 529582, at *10 (D.N.J. Feb. 17, 2012). A.M.'s success at Grayson is relevant, but only to the extent that it shows A.M.'s abilities and thus the level of progress the District should have strived for. Cf. Fuhrmann, 993 F.2d at 1039. So viewed, the areas in which A.M. excelled at Grayson do not show that the District's plan for A.M.'s education was inadequate. The advanced classes A.M. had the opportunity to take at Grayson went beyond the District's obligation under the IDEA to provide A.M. with a "basic floor of opportunity." M.R., 680 F.3d at 269. And the main area where A.M. fell short at the District—writing—remained an area of struggle even after A.M. left for the private school. In sum, the District met its obligation to provide A.M. with "an 'education.'" Endrew F., 137 S. Ct. at 999.

### B.    Alleged Procedural Violations

Parents also raise allegations of procedural violations of the IDEA. "[A]lthough it is important that a school district comply with the IDEA's procedural requirements, compliance is not a goal in itself … . Accordingly, a procedural violation is actionable … only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." M.R., 680 F.3d at 274 (alterations and quotation marks omitted). I find that the alleged procedural violations, assuming they were errors, did not deprive A.M. or Parents of any of these rights.

Parents first contend that the District failed to evaluate assistive technology that could have benefited A.M. The District did attempt some assistive technology (such as speech-to-text), but A.M. ultimately found it unhelpful. While it is possible the District could have evaluated other technologies or more thoroughly assessed the usefulness of the technologies it did provide, Parents do not identify any missed educational benefits that would have been achieved through assistive technology. Parents further argue that the District should have evaluated A.M. through a "Functional Behavior Assessment" and a "speech and language assessment." Again, however,

Parents do not identify how information gleaned from these assessments would have changed the education offered to A.M. As noted above, Parents largely do not take issue with the specific services detailed in A.M.'s IEPs. For this reason, the District's failure to conduct these evaluations did not deprive A.M. of a FAPE.

Parents also take issue with the way the District monitored A.M.'s progress on his IEP goals. Parents point out that in eighth grade, the District measured A.M.'s ability to complete assignments against the reduced workload and deadlines offered to A.M. as an accommodation rather than against the standards that applied to other students—which, in Parents' view, masked A.M.'s significant struggles with task completion. I agree with Parents that A.M.'s inability to meet even these reduced goals is relevant to assessing whether A.M.'s education was appropriately ambitious, and I have accordingly taken these facts into account in the preceding analysis. But for the reasons explained above, I find that A.M.'s progress was nevertheless sufficient under the standard of Endrew F.

Parents finally complain that the "transition goals" (goals for after high school) in A.M.'s IEPs were not "measurable." Again, however, Parents identify no educational benefit that was not achieved but could have been achieved through the use of measurable transition goals. Assuming Parents are correct that A.M.'s transition goals were not, but should have been, measurable, this deficiency does not amount to an actionable violation of the IDEA. M.R., 680 F.3d at 274.

### C.    Alternative Placement

Finally, because I am affirming the Hearing Officer's conclusion that the District provided A.M. with a FAPE, I need not consider whether Grayson would have been an appropriate private placement. See Munir v. Pottsville Area Sch. Dist., 723 F.3d 423, 426 (3d Cir. 2013) ("A court may grant the family tuition reimbursement only if it finds that the school district failed to provide

a FAPE … .”). I therefore do not address the Hearing Officer's alternative conclusion that Grayson was inappropriate.

## V.    <u>CONCLUSION</u>

For the reasons set out above, I will affirm the decision of the Hearing Officer and deny Parents' Motion for Judgment on the Administrative Record.

An appropriate order follows.